1   BRAD D. BRIAN (State Bar No. 79001)
       brad.brian@mto.com
2   TERRY E. SANCHEZ (State Bar No. 101318)
       terry.sanchez@mto.com
3   TINA CHAROENPONG (State Bar No. 242024)
       tina.charoenpong@mto.com
4   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
5   Thirty-Fifth Floor
    Los Angeles, CA 90071-1560
6   Telephone:  (213) 683-9100
    Facsimile:   (213) 687-3702
7

8   Attorneys for Defendant
    RAYTHEON COMPANY
9

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  AARON TRIBBLE, | CASE NO:  CV 07-3058 (JFW)(SHx) |
| 14          Plaintiff, | **SUPPLEMENTAL DECLARATION OF TERRY E. SANCHEZ IN SUPPORT OF DEFENDANT RAYTHEON COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES** |
| 15     vs. | |
| 16  RAYTHEON COMPANY, | |
| 17          Defendant. | |
| 18 | |
| 19 | [Reply in Support of Defendant Raytheon Company's Motion For Summary Judgment or, in the Alternative, Summary Adjudication of Issues; Defendant's Response to Plaintiff's Statement of Genuine Issues of Material Fact; and Defendant's Objections to Plaintiff's Statement of Genuine Issues of Material Fact Filed Concurrently Herewith] |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | Judge:  Hon. John F. Walter |
| 26 | Date:   September 14, 2009 |
| 27 | Time:   1:30 p.m. Pre-trial Conf. Date:  November 6, 2009 Trial Date:  November 17, 2009 |
| 28 | |

SUPPLEMENTAL DECLARATION OF TERRY E.
                                                         SANCHEZ

I, TERRY E. SANCHEZ, declare as follows:

I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel of record to Defendant Raytheon Company ("Raytheon") in the above-captioned action. I am duly licensed and admitted to practice before this Court. The contents of this declaration are within my personal knowledge. If called as a witness in this action, I could and would testify competently to the contents of this declaration.

1.    In my role as counsel in this matter, I was present at the deposition of Mary Jacquemine Heidt on July 9, 2009 in Santa Barbara, California. Attached as Exhibit E to this supplemental declaration are copies of portions of the transcript and the court reporter's certification (except that relevant excerpts have been bracketed pursuant to Local Rule 16-2.7).

2.    Attached hereto as Exhibit F are pertinent pages of a copy of the "Response to Department of Justice Investigation regarding Second Generation Detective Assembly A-12 Epoxy Bond." Plaintiff's counsel questioned Ms. Heidt about this document in her deposition and cites to part of her testimony regarding the document in Plaintiff's pleadings in opposition to summary judgment. The document is attached as Exhibit 8 to Ms. Heidt's deposition transcript.

I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed this 4th day of September, 2009, in Los Angeles, California.

TERRY E. SANCHEZ

# EXHIBIT E

ORIGINAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AARON TRIBBLE, )
)
Plaintiff, )
)
vs. )        CASE NO. CV 07-3058
)                JFW (SHx)
RAYTHEON COMPANY, )        CONFIDENTIAL
)
Defendant. )
_____)

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF MARY JACQUEMINE HEIDT

SANTA BARBARA, CALIFORNIA

THURSDAY, JULY 9, 2009

10:02 A.M. - 12:51 P.M.

REPORTED BY MELISSA PLOOY, CSR #13068

EXHIBIT E
-3-

*McDaniel Reporting*
& video conferencing

 1302 Osos Street
San Luis Obispo, CA 93401

805•544•3363  FAX 805•544•7427

 106 E. Boone, Suite D
Santa Maria, CA 93454

E-mail:mcdanielslo@charter.net                    www.mcdanielreporting.com

MARY JACQUYEMINE HEIDT                                                July 9, 2009

Page 10

```
 1        A    Yes.

 2        Q    Okay.  Who do you report to?

 3        A    I report to Laura Lee Jones.

 4        Q    And what is Laura Lee Jones' position?

 5        A    She is a supervisor in the cooler product segment.

 6        Q    Is that part of the Raytheon Vision Systems?

 7        A    Yes, it is.

 8        Q    Did you, at any point, ever report to Mostyn Gale?

 9        A    No.

10        Q    Is he still with Raytheon?

11        A    Yes.

12        Q    What's his position?

13        A    He's a manager for systems engineering.

14        Q    And what is his relationship in terms of an

15   organization chart to Laura Lee Jones?

16        A    None.

17        Q    So you report to Laura Lee Jones.  And what working

18   relationship do you have with Mr. Gale, if any?

19        A    I corresponded with him when personnel are needed to

20   support my programs.

21        Q    So do you tell him you need somebody hired or

22   transferred as defining someone with a particular set of

23   skills?

24        A    No.

25        Q    Okay.  Could you explain what you do?
```

8daa7ebb-de2c-436a-86f7-19a3aad2ead5

1       A    Mostyn assigns personnel to programs.  If the

2   program is not being served properly or with enough manpower,

3   then I discuss that with Mostyn.

4       Q    Okay.  And then what happens after you have the

5   discussion?

6            MR. SANCHEZ:  Objection.  Overbroad.  You can

7   respond if you know.

8            MR. KRAKOW:  Go ahead.

9            THE WITNESS:  We work together to solve whatever

10  issue the program is having.

11  BY MR. KRAKOW:

12      Q    Okay.  So that might be assigning more people, it

13  might be assigning somebody different, it might be training

14  people differently or supervising them or employing them

15  differently, any number of things, right?

16      A    Right.

17           MR. SANCHEZ:  Objection.  Compound.  You can

18  respond.

19           MR. KRAKOW:  Go ahead.

20           THE WITNESS:  Correct.

21  BY MR. KRAKOW:

22      Q    Is the -- is the second generation detection

23  assembly a product of Raytheon Vision Systems?

24      A    Yes.

25      Q    Okay.  And you mentioned earlier, I think, that it's

Page 20

1  Raytheon prior to the time that Mr. Tribble began to work at

2  the second generation detection assembly program?

3      A    Yes.

4      Q    Had Raytheon provided you with any training outside

5  the company itself, in other words, using either standard

6  educational institutions or companies that provide management

7  training or anything like that?

8      A    Yes.

9      Q    And can you give me some examples of the kind of

10  outside training that you had?

11      A    I believe one of the management courses was by

12  Mangleson.  That seems to ring a bell with me, but I'm not

13  sure that's the name of it.

14      Q    Okay.  So when you were listing the kind of training

15  that you had from Raytheon, you were including outside

16  providers as well as stuff that Raytheon did internally; is

17  that right?

18      A    Yes.

19      Q    Okay.  Do you have any certifications of any kind in

20  relation to your job, a CPA or financial adviser or MBA or

21  anything like that?

22      A    No.

23      Q    Okay.  Would you describe the circumstances that led

24  up to your request of Mr. Gale that Mr. Tribble be removed

25  from the second generation detection assembly program?

1      A    Over the length of time that Aaron worked on my

2   programs, I found him to be less than professional in his

3   technical writing abilities, less than thorough in

4   investigations.  He was not what I would call a dedicated

5   employee, had no sense of urgency and did not correspond with

6   the level of detail that is required of a systems engineer.

7      Q    Any other reasons why you asked to have him removed

8   from the second generation data -- detection assembly

9   program?

10     A    My request was strictly related to his performance

11  as a systems engineer.

12     Q    Okay.  Was there any particular event that led you

13  to make the particular request that you did that he be

14  removed?

15     A    No.  Because I asked that he be removed more than

16  once.

17     Q    Okay.  Let's start with the first time.

18          When was the first time that you asked him to be

19  removed?

20     A    I do not remember dates.

21     Q    Was there any particular event that the first time

22  led you to ask that he be removed?

23     A    No.

24     Q    Was there any particular aspect of performance or

25  failure to perform that led you to ask that he be removed the

Page 63

1    BY MR. KRAKOW:

2        Q    Again, take a moment to look at this.  The first

3    question I'm going to ask you, did you have anything to do

4    with its preparation?

5            MR. SANCHEZ:  Do you want to go off the record while

6    she looks at it?

7            MR. KRAKOW:  Sure.

8            THE VIDEOGRAPHER:  Time is 11:53.  We're off the

9    record.

10           (Pause in proceedings.)

11           THE VIDEOGRAPHER:  Time is 11:56.  We're back on the

12   record.

13   BY MR. KRAKOW:

14       Q    Okay.  So my first question was, did you have any

15   involvement in the preparation of Exhibit 8?

16       A    Yes.  From the standpoint that any documents,

17   program documents, that I had related to the subject were

18   collected.

19       Q    But you didn't draft this document?

20       A    No, I did not.

21       Q    Did you review versions of it for accuracy?

22       A    I do not recall reviewing this document.

23       Q    So the statements in this document don't represent

24   your memory at the time or your thinking at the time that it

25   was prepared or anything like that, you just provided

MARY JACQUYEMINE HEIDT                                              July 9, 2009

Page 66

```
1              MR. SANCHEZ:  Objection.  Mischaracterizes the

2   document, lacks foundation.  You can respond if you have any

3   knowledge.

4              THE WITNESS:  I am only aware of one other unit --

5              MR. KRAKOW:  Okay.

6              THE WITNESS:  -- that --

7              MR. SANCHEZ:  Whoa, whoa, whoa.  Were you done with

8   your answer?

9              MR. KRAKOW:  I'm sorry.  Go ahead.

10             THE WITNESS:  I'm only aware of one other unit that

11  displayed the kind of damage that serial number 11071

12  showed.

13  BY MR. KRAKOW:

14       Q    Okay.  If you look at Page 188, it says, "Returns

15  and A-12 cracks, but bond cracks would not cause most

16  failures."

17             Do you believe that to be true, bond cracks would

18  not cause most failures?

19             MR. SANCHEZ:  Do you have enough context to answer

20  that question?

21             THE WITNESS:  No.

22  BY MR. KRAKOW:

23       Q    So you don't know one way or the other?

24       A    No.

25       Q    Okay.  It would require looking at engineering
```

Page 67

1    failure analyses for any such concerns to be able to say

2    whether that was true or not, right?

3           MR. SANCHEZ:  Wait, wait, wait.  My objection here

4    is that you're pointing out one slide in a PowerPoint

5    presentation that is in progression of many other slides to

6    put this document in context.

7           MR. KRAKOW:  We're getting there.

8           MR. SANCHEZ:  So picking out one slide and asking

9    her a question about how it relates to the rest of the slides

10   is misleading.

11          MR. KRAKOW:  Okay.  I'll withdraw that question.

12   BY MR. KRAKOW:

13   Q    Take a look at Page 189.  The slide there says,

14   "Cracked A-12 or bent struts were identified in only 12

15   Failure Reports after opening."

16          Do you. -- what's your understanding of what that

17   means?

18   A    That of all the customer returns received on SGDA,

19   12 -- or 12 failure reports showed evidence of either cracked

20   A-12 or bent struts and the following data shows the serial

21   numbers and the dates of return.

22   Q    Okay.  At the time that you got Exhibit 7,

23   Mr. Tribble's PowerPoint presentation, late June or early July

24   2005, were you aware of any of these 12 listed failure

25   reports?

Page 72

1    an FPA, if you know?

2        A    FPA stands for focal plane array.

3        Q    Okay.  And were you aware in the spring of 2005 that

4    there was an issue that was being addressed on the second

5    generation detection assembly program concerning problems with

6    the focal plane array?

7        A    I was aware of the customer having image issues.

8        Q    Okay.  Do you also go by the name of Mary J.

9    Heidt?

10       A    That is my legal name.

11       Q    Well, you're entitled to it.

12            If you look at this document now, Exhibit 38, at

13   Page RT000905, it appears to be an e-mail communication to

14   Aaron from Steve Black and it shows, also, on the right, that

15   it went to Mary J. Heidt.

16            Do you recall receiving this document on or about

17   December 3rd of '04?

18            MR. SANCHEZ:  Um, I think you've mischaracterized

19   the document.

20            MR. KRAKOW:  905?  You're looking at 905?

21            MR. SANCHEZ:  Yeah.  I'm guessing here, but I don't

22   think the to cc line on the right refers to the address of the

23   text that begins Aaron very concerned about this.  I think

24   it's the addressee --

25            MR. KRAKOW:  The next one.

MARY JACQUYEMINE HEIDT                                                    July 9, 2009

Page 73

```
 1    BY MR. KRAKOW:

 2        Q    So look at 906.  That says something from -- to

 3    Jackie from Steve.  Did you receive 906 during December of '04

 4    from Steve Black?

 5        A    I assume so.

 6        Q    And if you look at the bottom half of the page, is

 7    that an e-mail that you received or that you sent?  "This is

 8    the latest in issues.  It is a calibration issue."  That one.

 9        A    I believe that is my e-mail message.

10        Q    Okay.  If you look at Page 909 of this e-mail trail,

11    908 and 909, I guess it is, did you receive a copy of the

12    message from Steve Black to Aaron that's on 909?

13        A    Yes.  I believe I received this e-mail.

14        Q    Okay.  And if you look at the date on Page 908, did

15    you receive this e-mail on or about June 16th of 2005?

16        A    I -- the e-mail seems to indicate that I received it

17    on that date, but I could not verify that.

18        Q    Okay.  You don't remember the exact date, but you

19    don't have any reason to think it's wrong; is that right?

20        A    I have no reason to think it's wrong.

21        Q    Okay.  Does it -- do you remember that you got

22    e-mails on this issue dealing with the focal plane before you

23    received Mr. Tribble's PowerPoint presentation that we've

24    marked as Exhibit 7, which has a June 24 date on it?

25        A    I don't remember this issue, specifically, but it
```

July 9, 2009

1    would indicate that I received this e-mail prior to receiving

2    the PowerPoint presentation.

3        Q     Okay.  So your understanding of what the e-mails --

4    how the e-mails work at Raytheon tells you that the dates are

5    correct, but you don't have an independent memory, correct?

6        A     No, I do not.

7        Q     Okay.  And if you look at Page 909, the last

8    paragraph of Mr. Black's e-mail to Mr. Tribble, it says, "Most

9    important is to get a plan together and make sure it's being

10   followed."  Did you agree with that?

11       A     Yes.

12       Q     That's something that you would have wanted

13   Mr. Tribble to do on this particular kind of problem, right?

14       A     Yes.

15       Q     Um, and you would consider it a reasonable thing to

16   do; is that right?

17       A     Yes.

18       Q     Um, it says, "Assign action items, track performance

19   and due dates, elevate issues that are not being closed in a

20   timely manner."  Did you agree with that?

21       A     Yes.

22       Q     And you would also agree that that would be a

23   reasonable thing for Mr. Tribble to do; is that right?

24       A     Yes.

25       Q     The next one says, "Communicate continuously and

MARY JACQUYEMINE HEIDT                                             July 9, 2009

Page 75

1    then," boldly, "LOUDLY."  Did you agree with that?

2         A    Yes.

3         Q    And would you agree that would be a reasonable thing

4    for Mr. Tribble to do?

5         A    Yes.

6         Q    And then, last, also all bold, it says, "Remember

7    our soldiers count on this product working every time,"

8    exclamation point.  Did you agree with that?

9         A    Yes.

10        Q    And this product refers to the second generation

11   detection assembly, correct?

12        A    Correct.

13        Q    And -- okay.  We're done with that document.

14             MR. SANCHEZ:  Do you have something to add?

15             THE WITNESS:  Yes, I do.

16             MR. SANCHEZ:  You were looking quizzically at the

17   document.

18             THE WITNESS:  Yes.  I'm looking quizzically because

19   this is referring -- the subject matter says, "SATA weekly

20   status."

21             So this was not related to the SGDA program.  It was

22   related to the SATA program.

23   BY MR. KRAKOW:

24        Q    Oh.  Okay.  Thanks for that clarification.

25             So you think 908 tells us it's about SATA; is that

McDaniel Reporters

EXHIBIT E
-14-

805 544-3363

8daa7ebb-de2c-436a-86f7-19a3aad2ead5

Page 76

1    right?

2        A    I believe 908 tells us it's about SATA because it

3    was a response to the distribution one, the weekly status

4    report.

5        Q    Okay.  And would you agree that was the same --

6    looking at 909, the same paragraph, those questions that I

7    just asked you about what Mr. Black said, would you agree that

8    that would also be true with respect to the second generation

9    detection assembly product?

10       A    If there were similar issues on SGDA, yes.

11       Q    Okay.  Take a look now at what we're going to mark

12   as Exhibit 41.

13   (Plaintiff's Exhibit 41 was marked for identification.)

14           MR. KRAKOW:  This is an e-mail series that's

15   starting with RT000934 and continuing through 943.

16           MR. SANCHEZ:  Counsel, you can mark your exhibits as

17   you'd like, but I just noticed on the last two exhibits, 38

18   and 41, you had two e-mail chains.

19           MR. KRAKOW:  I might have done that because I don't

20   understand and we may have to take them apart at some point.

21           MR. SANCHEZ:  No problem.  I just want to make sure

22   you're aware.

23   BY MR. KRAKOW:

24       Q    Looking at Pages RT00934 through and including 93 --

25   it looks like 940.  940.

```
1                    REPORTER'S CERTIFICATE
2   STATE OF CALIFORNIA          )
                                 )  SS.
3   COUNTY OF SAN LUIS OBISPO    )

4

5            I, MELISSA PLOOY, Certified Shorthand Reporter,
6   licensed in the State of California, holding CSR License No.
7   13068 do hereby certify:
8            That prior to being examined, the witness named in
9   the foregoing proceeding was by me sworn to testify the truth,
10  the whole truth and nothing but the truth;
11           That said deposition was verbatim-reported by me by
12  the use of computer shorthand at the time and place therein
13  stated and thereafter transcribed into writing under my
14  direction.
15           I further certify that I am not of counsel nor
16  attorney for or related to the parties hereto, nor am I in any
17  way interested in the outcome of this action.
18           In compliance with Section 8016 of the Business and
19  Professions Code, I certify under penalty of perjury that I am
20  a Certified Shorthand Reporter with License No. 13068 in full
21  force and effect.
22           WITNESS my hand this _____20th_____ day of
23  ____July____, 2009.
24                     Melissa Plooy
                     MELISSA PLOOY, CSR#13068
25
```

EXHIBIT E
-16-

McDANIEL SHORTHAND REPORTERS                    805-544-3363

# EXHIBIT F



RT000140
CONFIDENTIAL

Raytheon

# SGDA Customer Returns
## 1998 to 2007

- ■ 2,087 SGDA units of all types shipped
- ■ *Only 4 units* were returned with relevant issues
  - 385 returns of all kinds
    - ■ From Raytheon, prime contractor, end user
    - ■ Includes warranty and customer-funded repairs
  - 56 of the 385 were tested with "No Fault Found"
  - 18 of remaining 329 were customer-induced failures
  - Bond cracks noted in 12 of the 311 remaining returns
  - Bond cracks *potentially causal* in only 4 of those 12

Raytheon Proprietary and Export Controlled – See Side 2

44

RT000183
CONFIDENTIAL

Raytheon

# Returns and A-12 Cracks
## Cracked A-12 or bent struts were identified in
### *only 12 Failure Reports* after opening

- 9905959 (05/16/02)
- 9909154 (12/23/03)
- 9909329 (02/26/04)
- 9910275 (12/03/04)
- 9910387 (12/13/04)
- 9910681 (01/27/05)

- 9911060 (04/18/05)
- 9911065 (04/19/05)
- 9911280 (07/15/05)
- 9911641 (10/14/05)
- 9911678 (10/24/05)
- 9911767 (11/11/05)

Raytheon Proprietary and Export Controlled – See Side 2                    50

[Tab 5]
9905959 (05/16/02) SGDA 00029100
9909154 (12/23/03) SGDA 00029101
9909329 (02/26/04) SGDA 00008520
9910275 (12/03/04) SGDA 00007558
9910387 (12/13/04) SGDA 00029105
9910681 (01/27/05) SGDA 00029107

9911060 (04/18/05) SGDA 00029110
9911065 (04/19/05) SGDA 00006893
9911280 (07/15/05) SGDA 00007606
9911641 (10/14/05) SGDA 00007715
9911678 (10/24/05) SGDA 00007810
9911767 (11/11/05) SGDA 00007772

RT000189
CONFIDENTIAL

*Raytheon*

# Returns and A-12 Cracks
## Of those, 7 were cut open for SCA problems, unrelated to the coldfinger strut bond

- 9905959 (05/16/02)
- 9909154 (12/23/03)
- 9909329 (02/26/04)
- 9910275 (12/03/04)
- 9910387 (12/13/04)
- 9910681 (01/27/05)

- 9911060 (04/18/05)
- 9911065 (04/19/05)
- 9911280 (07/15/05)
- 9911641 (10/14/05)
- 9911678 (10/24/05)
- 9911767 (11/11/05)

Raytheon Proprietary and Export Controlled – See Slide 2

51

[Tab 5]
9909329 (02/26/04)  SGDA 00008520
9910275 (12/03/04)  SGDA 00007558
9911060 (04/18/05)  SGDA 00029110
9911280 (07/15/05)  SGDA 00007606
9911641 (10/14/05)  SGDA 00007715
9911678 (10/24/05)  SGDA 00007810
9911767 (11/11/05)  SGDA 00007772

RT000190
CONFIDENTIAL

Raytheon

# Returns and A-12 Cracks
## One was cut open for a broken electrical pin on the Header Assembly, also unrelated to strut

- 9905959 (05/16/02)
- 9909154 (12/23/03)    • 9911065 (04/19/05)


- 9910387 (12/13/04)
- 9910681 (01/27/05)

Raytheon Proprietary and Export Controlled – See Slide 2                    52

[Tab 5]
9909154 (12/23/03) SGDA 00029101

RT000191
CONFIDENTIAL

Raytheon

# Returns and A-12 Cracks
## Leaving 4 customer returns where epoxy cracks *might* have caused failures

- 9905959 (05/16/02)

  - 9911065 (04/19/05)

  - 9910387 (12/13/04)
  - 9910681 (01/27/05)

Raytheon Proprietary and Export Controlled – See Slide 2

53

[Tab 5]
9905959 (05/16/02)  SGDA 00029100
9910387 (12/13/04)  SGDA 00029105
9910681 (01/27/05)  SGDA 00029107
9911065 (04/19/05)  SGDA 00006893

RT000192
CONFIDENTIAL

Raytheon

# Returns and A-12 Cracks
## *But mishandling can also cause epoxy cracks*

■ Dropping from hand height to a hard floor could easily exceed design acceleration limits

■ Early in program, an internal Raytheon customer dropped a prototype unit and returned it to RVS

• Unit failed numerous tests and RVS cut the dewar open

• FFO was lifted from its attachment surface

• Strut was bent and epoxy bonds were cracked

Raytheon Proprietary and Export Controlled -- See Slide 2

54

[Tab 2] SGDA 00007845 (recalling prototype that had been dropped)

RT000193
CONFIDENTIAL

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I, the undersigned, declare that I am over the age of 18 and not a party to the within cause. I am employed by Munger, Tolles & Olson LLP in the County of Los Angeles, State of California. My business address is 355 South Grand Avenue, Thirty-Fifth Floor, Los Angeles, California 90071-1560.

On September 4, 2009, I served upon the interested party(ies) in this action the foregoing document(s) described as: **SUPPLEMENTAL DECLARATION OF TERRY E. SANCHEZ IN SUPPORT OF DEFENDANT RAYTHEON COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**

[X] By placing the original(s), a true and correct copy(ies) thereof, as set out below, in an addressed, sealed package(s) clearly labeled to identify the person(s) being served at the address(es) set forth on the attached service list.

[ ] **BY PERSONAL SERVICE (AS INDICATED ON THE ATTACHED SERVICE LIST)** I caused such envelope to be delivered by hand to the office of the addressee by local courier service; and/or

[ ] **BY FEDERAL EXPRESS OVERNIGHT DELIVERY (AS INDICATED ON ATTACHED SERVICE LIST)** I delivered the sealed Federal Express envelope(s) to an employee authorized by Federal Express to receive documents, with delivery fees paid or provided for.

[ ] **BY Electronic Mail (AS INDICATED ON ATTACHED SERVICE LIST)** By sending a copy of said document by electronic mail for instantaneous transmittal.

[X] **BY FACSIMILE (AS INDICATED ON ATTACHED SERVICE LIST)** By causing to be sent a true and correct copy(ies) of said document via facsimile transmission. The transmission was reported as complete and without error. A true and correct copy of the machine's transmission report, indicating the date and time that the transmission was completed without error is attached to this proof of service and is incorporated herein by this reference. The telephone number of the facsimile machine I used was (213) 683-9510. This facsimile machine complies with Rule 2003(3) of the California Rules of Court.

[ ] **(STATE)** I declare under penalty of perjury that the foregoing is true and correct.

[X] **(FEDERAL)** I declare under penalty of perjury under the laws of the United States of America and the State of California that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 4, 2009, at Los Angeles, California.

_____
Marsha Oseas

6117324.1

- 1 -

1

<u>SERVICE LIST</u>

2

*Aaron Tribble v. Raytheon Company*

3

CASE NO.:  CV 07-3058 JFW (SHx)

4

5    Marvin E. Krakow, Esq.
     Alexander Krakow & Glick, LLP
6    401 Wilshire Blvd., Suite 1000
     Santa Monica, CA 90401
7
     *Email: mkrakow@akgllp.com*
8
     Tel:  (310) 394-0888
9    Fax: (310) 394-0811

10   Counsel for Plaintiff

11

12   Phillip E. Benson, Esq.
     Warren-Benson
13   620 Newport Center Drive, Suite 1100
     Newport Beach, CA 92660
14
     *Email: philbenson@warrenbensonlaw.com*
15
     Tel:  (949) 721-6636
16   Fax: (949) 955-5177

17   Co-counsel for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

6117324.1
Updated 8/11/09

- 2 -