|  |  |
|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA | **PRIORITY SEND** |

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 07-3058-JFW (SHx)**                                   Date:  September 23, 2009

Title:        Aaron Tribble -v- Raytheon Company

---

**PRESENT:**

       HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

PROCEEDINGS (IN CHAMBERS):        ORDER GRANTING MOTION OF DEFENDANT RAYTHEON COMPANY FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES [filed 8/7/2009; Docket No.50]

     On August 7, 2009, Defendant Raytheon Company ("Raytheon") filed a Motion for Summary Judgment or, in the Alternative, Summary Adjudication of the Issues. On August 24, 2009, Plaintiff Aaron Tribble ("Plaintiff") filed his Opposition. On September 4, 2009, Raytheon filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument. The matter was, therefore, removed from the Court's September 14, 2009 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.    Factual and Procedural Background**

     Plaintiff was hired by Raytheon Vision Systems ("RVS") in January 2002 as a Senior Systems Engineer in its Goleta, California facility. In 2004, Plaintiff was assigned to work on the Second Generation Detective Assembly ("SGDA") and Standard Advanced Dewar Assembly II ("SADA II") programs. Plaintiff's duties as a Systems Engineer on the SGDA and SADA II programs included, among other things, project leadership, technical oversight, specification development, customer return support, factory support, and customer interfacing.

     In Spring 2005, a damaged SGDA unit, Customer Return 11071 ("CR 11071"), was returned to the SGDA program at RVS for investigation and repair. The SGDA is an infrared sensor used in thermal imaging applications, including United States government tanks for night vision. One of its

components is a coldfinger that is attached using A-12 epoxy to the rest of the unit via struts. CR 11071 was returned by Samsung Thales, the customer for the Korean military program that had purchased the unit, with catastrophic damage including bent or broken struts, cracked epoxy, and severed electrical connections. As the Systems Engineer for the SGDA project, Plaintiff was a member of the Failure Review Board for CR 11071, responsible for investigating the failure of CR 11071 and repairing or replacing the unit for the customer.

As part of his regular duties as Systems Engineer, Plaintiff prepared a draft presentation regarding the failure of CR 11071. In the draft presentation, submitted to other RVS employees for review and comment on June 24, 2005, Plaintiff stated, among other things:

- RVS currently believes that the failure may have been caused by some latent mechanical defect.
- Latent defects may be caused by mishandling, dropping.
- A latent defect (perhaps a crack) may have been present in the bonding material.
- Do [sic] to extensive damage, it is impossible to tell if there was a defect there before testing.

Other RVS personnel, including the Program Manager and Technical Director, disagreed with Plaintiff's belief that there may have been a latent defect that caused the failure. Because SGDA units are used in government tanks, Raytheon is required to report any latent defects in the product to the United States government.

Shortly after Plaintiff submitted the draft presentation, Plaintiff was informed by his immediate supervisor, Mostyn Gale, that he would be transferred from the SGDA and SADA II programs to other projects. One or two weeks later, Plaintiff discussed his transfer with Jackie Heidt, the SGDA and SADA II Program Manager, and attempted to determine whether his presentation played any role in his transfer. Ms. Heidt acknowledged that it did, telling him that she did not like his use of the term "latent defect." She advised him this term should not be used lightly and might cause problems for the company, and Plaintiff could have used a different term. In response to Ms. Heidt, Plaintiff defended his choice of the term "latent defect," stating, "if there's something wrong, it doesn't matter what else I call it. It's still going to be a problem." He further advised that he did not believe the Korean customer would "swallow any kind of sugarcoated language" and was not comfortable "sugarcoating" the language. During his discussion with Ms. Heidt, he also emphasized that he was merely doing his job, stating: "What do you expect me to do? I'm trying to give you the information that was requested of me and give my opinion, my best judgment as to what happened here."

In July or August 2005, approximately two to six weeks after his conversation with Ms. Heidt, Plaintiff placed an anonymous call to Raytheon's nationwide ethics hotline to seek advice as to whether there was any ethical issue with Raytheon's decision to transfer him. Because he did not want the ethics hotline to be able to identify him or his program, Plaintiff tried to be "as generic as possible" in the call, stating only that he brought up certain product issues and then was transferred from his program. Other than perhaps the site location, he does not recall providing his name, the identity of other employees, the program, the product, or any other identifying information to the ethics hotline. The ethics hotline advised Plaintiff to speak with his line supervisor, program manager, and Human Resources. Plaintiff never told anyone at Raytheon

that he had called the ethics hotline.

Two or three weeks after his call to the ethics hotline, Plaintiff approached Mr. Gale, his line supervisor, and told him that he believed that his transfer from the program was unfair and that Raytheon was retaliating against him for his June 24, 2005 presentation. Mr. Gale advised Plaintiff that he should discuss the matter with Ms. Heidt, not knowing that Plaintiff had already done so.

In early 2006, before Plaintiff was transferred from the SGDA program, another damaged unit ("CR 10266") was returned to his group for investigation and repair. CR 10266 was returned by Aselsan, a Turkish company. Plaintiff was again assigned to be a part of the Failure Review Board to investigate the reason for the failure of the unit. As part of his regular duties as Systems Engineer, Plaintiff discovered a "micro-hairline" crack in the A-12 epoxy and recommended additional testing.

Plaintiff was transferred from the SADA II program around January 2006 and from the SGDA program around March 2006 to smaller programs. In Spring 2006, nearly a year after Plaintiff's draft presentation regarding CR 11071, RVS underwent a reduction in force resulting in the layoff of about forty to fifty employees. Plaintiff was included in the reduction in force and he received a notification of layoff in May 2006.

Although Plaintiff consulted with counsel and first learned of the False Claims Act in early 2006, he never raised any issue regarding the potential latent defect with any government agency or other third party, did not consider filing a False Claims Act action until after his layoff, and never informed anyone at Raytheon that he was considering pursuing such an action.

In his First Amended Complaint, Plaintiff alleges the following claims for relief against Raytheon: (1) retaliation in violation of 31 U.S.C. § 3730(h) of the False Claims Act ("FCA"); and (2) wrongful termination in violation of public policy, by "stripping him of his duties and terminating him, in retaliation for engaging in activities protected under the federal False Claims Act." First Amended Complaint ("FAC"), ¶ 16.

Raytheon moves for summary judgment on the following grounds: (1) Plaintiff's claim for retaliation in violation of 31 U.S.C. § 3730(h) of the FCA fails because Plaintiff did not engage in protected conduct and Raytheon had no notice of any protected conduct; and (2) Plaintiff's claim for termination in violation of public policy fails because it is based entirely on the FCA, and thus fails for the same reasons as Plaintiff's FCA claim.

## II.    Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Taylor v. List*, 880 F.2d 1040,

1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

### III.   Discussion

#### A.   Retaliation in violation of 31 U.S.C. § 3730(h) of the FCA

The FCA protects "whistleblowers" from retaliation by their employers for actions taken in furtherance of a FCA claim against their employer. 31 U.S.C. § 3730(h). In order to prevail on a claim for retaliation under the FCA, Plaintiff must establish that: (1) he was engaged in protected conduct; (2) Raytheon knew that Plaintiff was engaged in such conduct; and (3) Raytheon retaliated against him because of the conduct. *Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1104 (9th Cir. 2008); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). Here, based upon the undisputed facts, the Court concludes as a matter of law that Plaintiff was not engaged in protected conduct under the FCA, and even if Plaintiff was engaged in protected conduct, Raytheon was not on notice that Plaintiff was engaged in such conduct.

Section 3730(h) only protects employees who have acted "in furtherance of an action" under the FCA. *Hopper*, 91 F.3d at 1269. Although specific awareness of the FCA is not required, in order to prevail on a claim for retaliation under the FCA, the plaintiff "must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Hopper*, 91 F.3d at 1269. An employee engages in such protected conduct where "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845 (9th Cir. 2002). And, as noted, in order to prevail on a retaliation claim under the FCA, the employee must show that the employer had

knowledge the employee engaged in such protected conduct.

When an employee acts in accordance with his job duties in investigating and reporting fraud, courts have generally held that the employee must show more than an investigation or report of such fraud to meet the "protected conduct" and notice requirements under section 3730(h). *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 191 (3rd Cir. 2001) ("Although reporting 'fraudulent' and 'illegal' activity to an employer may satisfy the 'protected conduct' and notice requirements in many § 3730(h) cases, in some instances where an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' and put his employer on notice of the 'distinct possibility' of False Claims Act litigation is heightened."). Specifically, "the employee must make it clear [to the employer] that the employee's actions go beyond the assigned task" in order to overcome the presumption that he is merely acting in accordance with his employment obligations. *Eberhardt v. Integrated Design & Construction, Inc.*, 167 F.3d 861, 868 (4th Cir. 1999). *See also Hutchins*, 253 F.3d at 191; *Rasmeyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994).

Here, the record is devoid of any evidence that Plaintiff engaged in protected conduct, or that Raytheon had notice that Plaintiff was engaged in protected conduct. Indeed, the record demonstrates that Plaintiff was merely performing his assigned job duties to investigate and report on the cause of unit failures, not that he was investigating or attempting to expose fraud or false claims against the U.S. government. Because Raytheon is required to report any "latent defects" in the SGDA unit to the United States Government, Plaintiff contends that his use of the term "latent defect" in the draft presentation as the potential cause of the failure of the SGDA unit is sufficient to show that he was engaged in protected conduct, and that Raytheon had notice that he was engaged in such conduct. However, the record demonstrates that his use of this term was prompted by his concerns about the particular customer who returned the product, and not by concerns about fraud being committed on the U.S. government. *See* Defendant's Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), ¶ 27 ("During his discussion with Ms. Heidt, Plaintiff told Ms. Heidt, '[I]f there's something wrong, it doesn't matter what else I call it. It's still going to be a problem,' that he did not believe the customer 'was going to swallow any kind of sugarcoated language,' and that he was not comfortable 'sugarcoating the language.'"). There is simply no evidence suggesting that Plaintiff believed or suspected that Raytheon was committing fraud against the United States government, and thus engaged in protected conduct. *See Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845 (9th Cir. 2002) (in order to constitute protected conduct, plaintiff must subjectively, and in good faith, believe that the employer is possibly committing fraud against the government); *see also McKenzie v. Bellsouth Telecommunications,* Inc., 219 F.3d 508, 517 (6th Cir. 2000) (finding that plaintiff's repeated refusals to falsify repair records and numerous complaints to supervisors were not sufficiently connected to exposing fraud or false claims against the government to constitute protected conduct); *Hopper*, 91 F.3d at 1269 (affirming summary judgment despite plaintiff's complaints that employer violated federal and state laws, because "the record quite clearly shows [plaintiff] was merely attempting to get [her employer] to comply with Federal and State regulations," not that she was investigating fraud or trying to recover money for the government).

Moreover, even if Plaintiff believed that Raytheon might be committing fraud upon the United States government and therefore might be considered to be engaged in protected conduct,

Plaintiff did nothing to notify Raytheon that his actions went beyond his assigned job duties, or that his use of the term somehow signified more than a routine internal report regarding the potential cause of a unit failure.  Instead, he reinforced the presumption that he was acting in accordance with those duties, and never gave any indication to Raytheon that he was concerned about fraud or false claims.  *See* SUF, ¶ 28 ("During his discussion with Ms. Heidt, Plaintiff told Ms. Heidt that he was merely doing his job and told her, 'What do you expect me to do? I'm trying to give you the information that was requested of me and give my opinion, my best judgment as to what happened here.'").

Accordingly, based upon the undisputed facts, the Court concludes that Plaintiff was not engaged in protected conduct under the FCA, and even if Plaintiff was engaged in protected conduct, Raytheon did not have notice that Plaintiff was engaged in such conduct.  Plaintiff's claim for retaliation under the FCA fails as a matter of law.

### B.    Wrongful termination in violation of public policy

Plaintiff's state law claim for wrongful termination in violation of public policy fails for the same reasons that his FCA claim fails, as it is depends entirely on Raytheon's alleged violation of the FCA.  *See Grinzi v. San Diego Hospice Corp.*, 120 Cal. App. 4th 72, 86 (2004).  Although Plaintiff attempts to assert new bases for his claim not alleged in his Complaint, these new bases cannot be asserted at this stage in the litigation without contravening Federal Rule of Civil Procedure 8.  *See Pickern v. Pier 1 (U.S.) Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (citation omitted) ("Rule 8's liberal notice pleading standard . . . requires that the allegations in the complaint 'give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'").

Accordingly, Plaintiff's state law claim for wrongful termination in violation of public policy fails as a matter of law.

### IV.   Conclusion

For the foregoing reasons, Raytheon's Motion for Summary Judgment is **GRANTED.**

IT IS SO ORDERED.